And our next case is number 17-1290, Steuben Foods, Inc. v. Nestle USA, Mr. Fisher. May it please the Court. The Board erred in several respects in this IPR, both substantively and procedurally. Substantively, the Board erred in construing sterilant concentration level so broadly that it reads the invention out of the claims. Under the proper construction, the final written decision should be reversed because there is no evidence in the record that the asserted prior art taught maintaining the airborne sterilant concentration levels of the various zones of the sterilization tunnel. Even under the Board's overly broad construction... So what you're doing is you're saying that the Board's claim construction is wrong insofar as they said that an on-the-bottle measurement would be within the claim language, right? That's correct. And if I understand correctly, the Board found that the claim construction didn't make any difference with respect to the claims, perhaps, other than Claim 3. Is that correct? That's what the Board said, but there is no substantial evidence to support such a finding because the references do not discuss airborne sterilant concentration levels whatsoever, let alone maintaining a ratio of the airborne sterilant concentration levels among the zones. Well, so you'd have to say that the Board's conclusion that under your claim construction the claim was still obvious was not supported by substantial evidence then, right? That's correct. Okay, why isn't it? Because the references are silent as to airborne sterilant concentration levels. So there's no prima facie case of obviousness of having or establishing... Didn't they say that Stowell disclosed 300,000 parts per million, right? That's a different number. That's not airborne. That's not airborne? No. They found it was, didn't they? No, they found that that number comes from the 30% hydrogen peroxide in the tank, 30% being 300,000 parts. Well, they said when it was vaporized, so it would be 300,000 parts, right? I don't believe the Board said that. They said that there was a, they did not say that it was airborne sterilant. They said that there was a disclosure in Scholey with respect to air flows, and our position on that was that those air flows were to prevent contaminants from entering. They were not the inventive air flow regime here, which would control the migration of the airborne sterilant. Does our prior decision, does that have any relevance here, and if so, what is it? Only that the challenge, the result effective parameter challenge, the only way that the testers were able to get there was to rely on what was found in all the references, which was that there was evidence of the residual requirement. So in this case, does a prior ruling help you or hurt you? It's just, neither. There are different claim terms. Aseptically disinfecting, aseptic is not a claim term here. It's just further evidence that all the references dealing with aseptic processing suggest and address the 178.10.05 residual requirement. The Board did not address airborne sterilant concentrations levels in the final written decision. Okay, in this case, you're saying that SHL does not disclose any type of airborne mix, or that this is used, that the sterilization is used in an airborne manner. In a what? Airborne. Yes, there's no disclosure of that. But the Board found that there was, right? The Board did not address airborne sterilant in the final written decision. Well, SHL says a sterilizing agent is continuously sprayed as a mist into the spraying compartment. Then goes on and talks about sterilizing H2O2 warm air mixture flows around. That's not airborne? Oh, there's certainly airborne sterilant, but what the claims require is establishing zones that have different concentrations of airborne sterilant. And maintaining a ratio of those airborne sterilant concentrations among the zones. At a number of 5 to 1 in most claims, and 0.1 to 1,000 ppm in other zones. And none of the references discuss that concept. Okay, but suppose we were to agree with the Board's claim construction. That it would encompass both airborne concentrations and concentrations on the bottle, on the container. Do you lose then? We do not lose because the Board committed a number of procedural errors. On this point, you would lose. On this point, we would not lose because there's no substantial evidence to find. There are no findings in the final written decision with respect to maintaining those numbers. But that's a different point. I'm just saying in terms of the ratios. If the Board was correct that it would include measurement on the container, you'd lose on that point, right? As to the claims with the 5 to 1 maybe. Conceptually, it makes no sense to me what the Board found. But try to go with me. Because I'm asking a hypothetical. If we agree with the Board's claim construction in this respect. Then the Board was, there's no basis for saying the Board was incorrect in finding that on the bottle measurements were satisfied. Correct. The claims require much more. They require, I understand. They require ratio and maintenance and yes. So why isn't the Board's claim construction right? Because the FDA regulations, which seem to be the focus of this patent as well as the others, are talking about the levels of sterile on the bottle and not in the air, right? In the other patents and the other claim terms in aseptically disinfecting, what this is, and yes it's still within the FDA regulations, 21 CFR 113 also requires that the sterilization of the packaging, which implies pying sterile and getting it off, and the filling of that sterile package with sterile food be done in a sterile environment. These claims are directed to how to set up that sterile environment and maintain a machine that can achieve the sterilization, getting the high kill level using enough sterile in there, and fill the aseptically processed product into the sterile bottle in a way that won't violate the FDA's regulations for both the kill and the residual. And this is the regime for managing that, what's called a sterile tunnel. We're going to have high levels of sterile concentration where you're doing the sterilization. We need to have a low level of sterilization, airborne sterile where we're doing the filling. Do the FDA regulations have an airborne standard? No. No, this is set forth in the patent. My question is, in the light of that fact, why isn't it reasonable for the board to construe this is addressed to the on-the-bottle measurements? It's a different concept. Certainly any bottle that goes through that machine is going to have to meet the FDA's 178.10.05 residual requirement. You have to prove that the machine can do that. But what these claims are directed to is establishing an airflow regime and an airborne sterile concentration regime that can facilitate that process and still meet the FDA's requirements. Bottles will still have to be tested for the residual, satisfying the residual. As will the bottles have to be tested to get the sufficient kill. These claims are directed to maintaining airborne sterile concentration among the zones in such a system. Among what? What did you just say? These claims are directed to maintaining airborne sterile concentration levels among the various zones of the aseptic system. There's a filling zone and a sterilizing zone and capping zone. And your argument is that the prior art doesn't disclose this airborne sterilization in all the zones or in certain zones? The prior art does not disclose airborne sterile concentration levels whatsoever. Nor does it disclose maintaining them at relative levels in the system. The prior art is silent on that. As to the levels or as to just the use of the airborne sterile? Airborne sterile is no. To spray sterile. It's the atmosphere. The airborne sterile of the zone itself that the prior art is silent on. You've got a machine that's got a sterilization zone. What's the airborne sterile concentration in that zone as compared to the airborne? I understand that. I just read to you from different portions of the show reference. It seems to me to meet that limitation. They don't discuss any ratio from zone to zone? That's what I was asking. What's the relevance of the ratio with respect to whether there's an airborne sterile that's used or not? Airborne sterile is used. SHOEI does discuss that, yes. That's what I was asking. Yes, I'm sorry. I apologize if I missed that point. What the prior art does not show is that it's going to be at this level relative to this level in these two different zones based on what's happening in those zones. But SHOEI discloses 300,000 parts per million, right? I'm sorry? SHOEI discloses 300,000 parts per million. SHOEI discloses using 30% hydrogen peroxide. Which the board found translated to 300,000 parts per million, right? In the tank. Yes. But once it's airborne, it's not going to be 300,000. But they found that it would be, right? No, I think that they said, I think what the board's findings are is that you can look at the drop, a drop of sterile at any point in the zone. And a drop of sterile in these... What I'm asking is what they found about SHOEI. Didn't they say that it discloses... They did not address airborne sterile concentration levels in the final written decision. This is on page 23. We find that the concentration of 30% solution of hydrogen peroxide will remain close to 300,000 parts per million in the liquid phase at some point after it's sprayed into the spraying compartment. Right? After condensation. That would be in the liquid form, not in the airborne. And it talks about your expert. Did you acknowledge that after condensation, the concentration of hydrogen peroxide that coats the containers is somewhere in the neighborhood of 30% or 300,000 parts per million, right? This is saying nothing more, Your Honor. And this really demonstrates why we think this claim construction is wrong. We're saying nothing more than if you have 30% hydrogen peroxide in the tank and you use it in a system and it condenses back down and you look at the drop of sterile wherever you are, it's going to be that 30% hydrogen peroxide again. But that's not what these claims and that's not what this invention is about. Well, that comes back to the claim construction. Yes. If it's airborne sterile, it's not going to be that 30% hydrogen peroxide dispersed in the air is not going to be 30% airborne sterile. The board disagreed with that argument. The board disagreed that you have to look to airborne sterile. They said that you can look at a drop. I don't think they talked about a drop. They talked about concentration on the bottle. Condensed. Yes. And the 30% is condensed and the .5, conceptually now the .5 is how many of those drops can remain in the bottle before you fill it. And it has to be less than .5 ppm. It's an entirely different concept from maintaining, establishing zones with partitions, establishing air flows throughout the zone, having different pressure levels so that the migration of sterile goes in different directions. That's what these inventions claim. And the claims set forth sterile concentration levels of the zones or in the zones, not in the liquid itself. I'm going to save the rest of your rebuttal time here. Akagi. Good morning, your honors. May it please the court. My name is Tyler Akagi and I represent Nestle USA. I'd like to begin by following on to the comments just made by Mr. Fisher regarding what he characterized to be the nature of the invention disclosed in the 435 patent. The context of the prior art here for the patentability dispute is critical. Mr. Fisher pointed to different zones, partitions, and air flows as characterizing the 435 patent's invention. Although none of those features are claimed. Critically, though, the prior art, Scholey, teaches all of those features. It teaches a spray zone that you fill with a hydrogen peroxide mist, as Judge Rainier read from Scholey. It teaches a drying zone where sterilant is removed from the packages and removed from the system via vents. And it teaches the filling zone where the foodstuff is packaged into the product. It also teaches partitions, just like the later 435 patent, specifically to allow the packages to pass through without allowing that sterilant mist also to pass through. And in addition, Mr. Fisher noted the air flow regimes and the Scholey reference discusses the same air flow regimes. The general idea of having a higher pressure air in the filling zone so that the air tends to go upstream and keeps things from migrating downstream. Specifically, that's Scholey column 6, lines about 37 to 42. So in the context of the prior art, which shows that the general conditions claimed in Steuben's patent claims were known. The idea of having a higher concentration in the spraying zone than the filling zone. In fact, that point was not disputed by Steuben and its expert below. They conceded that Scholey would have some higher concentration in the spraying zone than the filling zone. The evidence also showed, as I just laid out, that the mechanisms used to achieve these general conditions also were known from Scholey. So against that backdrop, where the general conditions were known and the mechanisms were known, the patentability question is whether it was obvious to have the particular sterile concentration ratios that Steuben claimed in its patents. So one of the questions here, putting aside the claim construction, and let's assume hypothetically that Steuben's claim construction were adopted. Did the board find that Scholey rendered the claim obvious under that construction? It did. In fact, Your Honor, the board performed two alternative analyses. It conducted the analysis under the construction that it adopted, which we believe is correct, which is not limited to airborne concentration. Then the board did specifically analyze obviousness under the airborne concentration construction. That's the whole reason for the result-effective parameter analysis. There's no reason for that analysis under the board's construction, which just looks at, like, you've got 30 percent concentration sterile being sprayed in one zone, and you have less than 0.5 parts per million residual downstream. That's a 600,000 to one ratio. That, you know, under the board's construction, it's very straightforward. The entirety of that result-effective parameter analysis was directed to Steuben's airborne construction. And Mr. Fisher has argued that the prior art is silent as to the maintenance of any particular ratio, if you construe the claims to require an airborne concentration. But that argument is wrong for a couple of reasons. First, the argument really is of no moment given the result-effective parameter framework under which the board considered the evidence. Under this court's precedent, when the evidence shows that the general conditions claimed in the patent were known and that the mechanisms to achieve those conditions were known, then absent evidence of unpredictability or, I'm sorry, of criticality or some sort of unexpected result, those claims are obvious. It doesn't matter specifically what those numbers are. That framework says that, you know, as a matter of fact, when these general conditions are known, you don't get credit for a patent just for quantifying one of the values that fall within the sort of, you know, known normal operation of these devices. Well, I'm not sure that's true. I mean, I thought that the board was using the result-effective parameter thing to say that you would try to comply with the FDA regulations, and that's what it would lead you to. But it was result-effective in the sense of being an objective to comply with the FDA regulations. Well, I think that that's right, actually. I think that that's part of it. That's part of the result that the prior art knew that you needed to achieve. There are kind of two ends of this machine. One of the results that needs to be achieved is adequate sterilization. The prior art teaches you that you need to apply, for example, in Sholey, a 30 percent concentration to achieve adequate sterilization. Dr. Heldman, Nestle's expert, testified that that level needs to be maintained. If you're going to get consistent sterilization, this is a continuous process. Each bottle needs to reach that level. And at the end of the system, you also need to maintain that residual level to achieve the FDA compliance. And so it certainly factors into the fact findings made by the board that led them to conclude that this was a result-effective parameter, that maintaining this ratio or maintaining this concentration was known and was result-effective. Maintaining the residual concentration was known and was result-effective. The ratio logically follows, regardless of whether the prior art characterizes the two in a specific relationship or not. When you maintain the two numbers, the ratio is also maintained. Mr. Fisher also made some arguments about whether there was substantial evidence to support a finding that the prior art taught to maintain those ratios. But as I noted, it doesn't matter if the prior art tells you to maintain a ratio. When the prior art tells you to maintain the sterile concentration for sterilization and the residual, the ratio naturally follows. And in making this finding, the board relied in part on the testimony from Dr. Heldman, who testified that it would be common sense to maintain the sterile concentration that you're spraying, because you want to get consistent sterilization of the bottle. It's the entire point of these machines. And Stubin had taken issue in the briefing with Dr. Heldman's use of sort of a common sense assessment, argued that you cannot use common sense to provide a claim limitation that's missing from the prior art. But that's not what happened here. The limitation is present in the art from the teachings of the sterile concentration to be applied and the residue to remain. Dr. Heldman's testimony was simply how a person of ordinary skill in the art would interpret those teachings. But in addition, there is also nothing that prevents common sense from being invoked to supply a missing limitation, even if the limitation were considered to be missing here. Dr. Heldman's case that Stubin cites is the Arendi case, which says that common sense may be invoked to supply a limitation if it's supported by evidence and a reasoned explanation. And those were both present here. I'd like to now turn to the board's claim construction and our belief that it is the correct construction. The board's construction is the proper, broadest, reasonable interpretation, because it accounts for the very use of the sterile concentration terms throughout the patent specification. As Judge Steik noted, some of the important concentrations in these systems are the concentration that you use to sterilize the bottles, the concentration of the sterile that contacts the bottles and kills the bugs, as well as the sterile concentration remaining, the residual concentration, because of its impact on food safety. And the patent specification, although it does discuss gas-laden sterilants, airborne sterilants in one paragraph, it also does discuss the importance of the sterilization aspect and the residue. At one point in column five, lines two through six, the patent says, the present invention uses hydrogen peroxide with a concentration of less than about 35 percent and ensures that the bottles have less than about 0.5 ppm of residual hydrogen peroxide after each bottle is sterilized. And the board's construction accounts for the very use of concentration terms throughout the patent specification. The board's construction also accounts for the prosecution history. At one point during the prosecution, Steuben attempted to argue over a prior art reference, Kelbrick, which had some disclosures about the residual concentration as 0.5 ppm residual. And in a response to an office action, Steuben characterized that as a sterilant concentration level. So clearly during prosecution, Steuben did not consider that term to be limited only to airborne concentrations. And in addition, the board accounted for Steuben's infringement contentions in the parallel litigation, in which Steuben has cited the concentration of the liquid sterilant that Nestle uses to sterilize the bottles and the concentration of the residue remaining in those bottles as the basis for its allegations that Nestle satisfies these claims. Now, in its latest contentions, Steuben also argues that the sterilant is airborne at some point in the Nestle system, but it never argues that there is any particular airborne concentration in any particular zone. So at a minimum, Steuben's infringement contentions support that the board reached the right conclusion in interpreting the claims. Steuben has argued that the board failed to explain the rationale for rejecting Claim 3, which recites a 10,000 to 1 claim limitation. It depends from Claim 1, which recites the 5 to 1 claim limitation. But the premise for Steuben's argument is incorrect. Steuben did not separately argue for the patentability of Claim 3. It simply argued that its patentability arguments for Claim 1, which it called representative below, applied just as much to Claim 3, only more so. Moreover, under the board's result effective... They did mention Claim 3 in their response. I'm sorry? They did mention Claim 3 in their response. Correct. I think the mention of Claim 3 was effectively sort of tacked on after a discussion of the concentration ratios generally. I mean, for example, on 2622, say, to that end, it's readily apparent there'd be no reason to use a ratio as high as 10,000 to 1 as recited in Claim 3. Right. But that is simply an extension of the argument that it had made before with respect to the other claims. But I think that maybe a more important point is that the board's result effective parameter analysis is not tied to any specific limitation, any specific ratio. Under that analysis, the general conditions of the claims were known, and the mechanisms to achieve those general conditions were known. And so the analysis applies regardless of whether the ratio is 5 to 1 or 10,000 to 1 or, you know, hypothetically a million to 1, any ratio that Steuben might have claimed, unless there's evidence of unexpected results or criticality, and the board found that. I'm not sure that's true. I think the board's decision probably has to be defended on whether prior art disclosed these ratios and that you can use the result effective parameter to say that they did. But I don't think you can just pluck a parameter out of the air and say, well, because it's desirable to have some sort of parameter, you know, that their claim is obvious because they have a different parameter than was used in prior art. Well, I think it wasn't just plucked out of the air. There were fact findings, as Your Honor noted before, that Dr. Heldman, Nestle's expert, had testified that the concentration of sterilant sprayed into the air would be at 30 percent. And there was testimony from Steuben's expert in a prior proceeding explaining that when you- Are any of those fact findings sufficient to show a 10,000 to 1 ratio required by Claim 3? Yes. I'm out of time, but if I may respond. The fact finding relating to the consideration of Steuben's expert, who analyzed what happens to the concentration of a liquid sterilant when it's turned into a spray. And that expert, according to his calculations, determined that a 30 percent concentration of liquid sterilant would be about 29.7 percent concentrate when turned into a spray. The reason is that, you know, air being so light, having so little mass, barely dilutes the concentration of the sterilant at all. So that is evidence that supports the board's analysis there. Thank you. Mr. Fisher. This final written decision issued before this court's guidance in Magnum Oil and runs afoul of it in several respects. Most importantly and critically, I believe, is that the result effective parameter theory that we're discussing here is not Nestle's theory. It was not set forth in their petition. It was set forth by the board in the institution's decision. I think the board, when it was talking about result effective parameter, was just talking about the incentive to satisfy the FDA standards. That's, in my view, what they meant by that. But that wasn't the challenge. And what the board did when it did that. It's not a question of whether it's the challenge. It's the question of whether the ratios, it would be obvious to use these ratios. And they said that, you know, it shows an upper ratio of 300,000 parts per million and that there would be a result effective parameter to try to achieve the FDA residual requirement, which would lead you to reduce that so that you got within the five to one ratio or the ratio of claim three. The initial matter, the board can't put forth a theory on behalf of petitioner, but with the effect of doing the result effective parameter, pursuing the result effective parameter theory here, is it shifted the burden to Steuben, patent owner, to come forth with evidence of criticality and unexpected results where that burden should have been shouldered by Nestle in the petition to show that there was no criticality and no unexpected results. So the burden has been flipped, and under Magnum Oil, that's improper. The burden should never shift to petitioner in an IPR. I think we're out of time now. Thank you, Mr. Fisher. Thank both counsel and cases.